(No. 49766.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. KENNETH C. ECHOLS *et al.*—(Johnny R. Wilson,
Appellant.)

*Opinion filed December 4, 1978.*

Mary Robinson, of Elgin, and Richard J. Wilson, of Springfield, Deputy Defenders, of the Office of the State Appellate Defender (Richard E. Cunningham, Assistant Defender, of Elgin, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield (Donald B. Mackay, Melbourne A. Noel, Jr., and Fred Montgomery, Assistant Attorneys General, of Chicago, of counsel), for the People.

MR. JUSTICE CLARK delivered the opinion of the court:

The appellant, Johnny Wilson, was convicted of one count of burglary (Ill. Rev. Stat. 1973, ch. 38, par. 19–1) in the circuit court of Macon County. A majority of the Appellate Court, Fourth District, affirmed (48 Ill. App. 3d 885), holding, *inter alia,* that appellant had not been denied the effective assistance of counsel as a result of his having been represented at trial by the same attorney who represented appellant's two co-defendants in the joint trial of the three. We granted appellant's petition for leave to appeal on that issue, and we now reverse.

On June 11, 1974, a grand jury indicted appellant, along with Kenneth Echols, William Echols, Thomas Ferguson, and Gregory Van Cook, for burglary and attempted burglary in connection with a June 5, 1974, incident at Valley's Tavern in Decatur. (The State subsequently nol-prossed the charge of attempted burglary.) At a preliminary hearing held on June 21, 1974, the court appointed the public defender to represent all of the defendants except appellant, who evidently indicated that he intended to retain counsel. The court did, however, appoint the public defender to represent appellant for purposes of the preliminary hearing. On July 5, 1974, at a subsequent hearing, the court sought to determine who was representing the appellant. From the ensuing colloquy, it appears that the attorney whom appellant had intended to "retain" was named Birk, an assistant public defender, who had represented appellant on a prior misdemeanor charge:

> "The Court: Once again, earlier you said you would hire an attorney, you could and plan to.
>
> Appellant: No, I was trying on planning to get Mr. Birk, you know, to see if he could take my case.
>
> The Court: By hiring him?
>
> Appellant: No, by Public Defender.
>
> The Court: You don't appoint—*you don't select your public defender,* especially when you posted bond and you posted, what, $300.00?
>
> Appellant: Yes.
>
> The Court: We will see—you will have to prepare an affidavit—and then we'll see if you qualify.
>
> Appellant: Right." (Emphasis added.)

Sometime after the foregoing hearing, appellant filed an affidavit of indigency, and requested appointment of counsel. The public defender was appointed. Approximately one month later, the public defender moved to sever the trials of Ferguson and Van Cook from that of appellant and the Echols brothers, on the grounds that Ferguson and Van Cook had made statements exculpating themselves at the expense of the appellant and the Echols

brothers, and had made admissions prejudicial to appellant and the Echols brothers. The State did not object, and the court granted the motion. Two days later, the public defender also obtained leave to withdraw as counsel for Ferguson and Van Cook, for whom the court appointed separate counsel.

The first trial of this cause ended in a mistrial (on August 26, 1974) after the jury was impaneled but before opening statements. The second trial also ended in a mistrial (on September 24, 1974) as a result of a State witness' reference to the defendants' having known each other in jail. The third trial resulted in the conviction at issue here.

At that trial, defendant Ferguson, testifying under a grant of immunity, gave the following account of the events of the early morning of June 5, 1974:

At about 5 a.m., appellant, who was driving, and the four others, were headed toward Decatur on Woodford Street, when they passed Valley's Tavern. About this time someone in the car evidently said something which caused appellant to turn the car around and head back toward the tavern shortly after they had passed it. Appellant drove around to the back door of the tavern, where he and the Echols brothers got out of the car and attempted to open the back door. Ferguson drove himself and Van Cook away from the scene to the nearest intersection, while the others walked around to a drive-up window on the other side of the building. Ferguson drove the car back to the tavern about a minute and a half later and picked up appellant and the Echols brothers. None of the three appeared to be carrying anything at the time and none opened the door to the car's trunk before getting in. Ferguson then drove back toward Decatur and turned down a side street, turned around, came back out onto the street on which he had been driving and drove to Longview, where the car was stopped by Decatur police.

When the police arrived Ferguson was sitting "up under the wheel." Van Cook was on the passenger side. The Echols brothers "were in the back," and Johnny Wilson was "standing by the back door."

Julian and Galen Beckler, who worked as custodians at the tavern, also testified to the events of about 5 a.m. on June 5, 1974. Julian testified as follows:

As he pulled into the parking lot at the tavern, he saw a tall, skinny Negro male with short hair and sideburns, wearing a red shirt and light-colored pants, walking away from the drive-up window on the west side of the tavern. He then observed two more individuals standing at the drive-up window, one wearing a floppy hat with silver studs around the brim and another wearing a green army shirt. Julian identified People's exhibit No. 1 as the hat he had seen, which then had holes where the silver studs allegedly had been. Julian also observed two men in the kitchen of the tavern. As he left to call the police, he observed a "two-toned green Buick or Oldsmobile, about a '56," parked down the block. Two or three of the people he had observed were then running toward the car.

After calling the police, Julian headed back toward the tavern, at which time he observed "the guy with the hat" driving the car that had been parked, "the guy with the red shirt" sitting on the passenger side of the front seat, and about five other people in the car. Julian, however, could not identify any other individuals he had seen. He did, however, accurately remember the license plate number of the car.

Galen Beckler, who had been in the car with Julian, also testified. Galen only observed three individuals at the tavern; one standing outside the package window and wearing white pants, and two inside the building, of whom one had on a green army jacket and another a black hat with studs. Galen also identified the now-studless hat.

Another witness, Ronald Atkins, saw the car (with at

least four people in it) during the maneuvers described by Ferguson. Gary Doolin also saw the car at about that time, but saw five people in it.

Roy Pritchett, the police officer who stopped the vehicle, testified that appellant was behind the wheel, wearing "a blue windbreaker, gold shirt and wine-colored checked pants"; Kenneth Echols was wearing kind of "an off-white pair of pants and a red pullover shirt"; and William Echols "also had on a pair of white pants, tan jacket and a large black floppy hat"—which Pritchett identified as People's exhibit No. 1.

Officer Ronald Wetherell, Pritchett's partner, also testified that, when arrested, Kenneth Echols was wearing a red shirt and appellant was wearing checkered pants. Pritchett also rendered an in-court identification of appellant.

The arresting officers were unable to open the trunk of the car with any of the keys given them by appellant, and had to obtain access to the trunk by removing the back seat. The owner of the tavern identified a tape player found in the trunk of the car as one belonging to her.

In addition, another police officer, Clifford Kretzinger, testified that he removed several pieces of broken plexiglass, which had covered the package liquor drive-up window of the tavern. One of those pieces contained a fingerprint, which was subsequently lifted and preserved for comparison to the defendants' fingerprints. Additional testimony later established that the fingerprint found on the piece of broken plexiglass matched that on People's exhibit No. 11, a police fingerprint card bearing the name Kenneth Echols.

Officer Lewis Madia testified that he assisted Kenneth Echols in placing his fingerprint on People's exhibit No. 11. However, when asked if he could identify the individual whose print was on People's exhibit No. 11, Madia pointed not to Kenneth Echols, but to the

appellant, Johnny Ray Wilson, and the public defender asked that the record so indicate.

Without the jury present, the State sought leave to obtain appellant's and Kenneth Echol's fingerprints, stating:

"Your Honor, the testimony of the witness, Lewis Madia, who took the fingerprints on June the 5th, and his identification in court of one of the defendants leaves the question—leaves the area of the fingerprints somewhat questionable in the minds of the jury as to who is the man who he fingerprinted that morning. The People's position is that we want to clarify this for the jury right now."

However, the public defender objected that to do so would violate appellant's and Kenneth Echols' privilege against self-incrimination. On advice of the public defender, both appellant and Kenneth Echols reiterated the public defender's objection when questioned by the court.

Subsequently, the public defender unsuccessfully objected to the admission of the testimony identifying exhibit No. 11 as containing a print identical to the one found on the piece of broken plexiglass. However, in closing arguments, he chose to point to the ambiguity regarding the fingerprints as limiting its probative value relative to all of the defendants, rather than specifically arguing that the print probably did not belong to appellant.

The State, in its closing argument, argued alternatively that, either (1) the print belonged to Kenneth Echols and Officer Madia simply had been confused by the resemblance between Kenneth Echols and appellant, or (2) to deceive Madia, appellant had identified himself to Madia as being Kenneth Echols, thereby placing his prints on the card. Over the public defender's objection, the court ruled that, as to alternative (2), "This is proper speculation and inference from the evidence." (However, at oral argument in this court, the State conceded that the fingerprint in question was that of Kenneth Echols and not that of the

appellant.)

The court gave People's instruction No. 10 (Illinois Pattern Jury Instruction, Criminal, No. 14.05 (1968), hereafter IPI):

> "A person commits the crime of burglary who, without authority, knowingly enters a building or any part thereof with intent to commit a felony or theft therein."

However, because of certain inconsistencies between the accounts given by the several State witnesses, the court refused to give People's instruction No. 9 (IPI Criminal No. 5.03):

> "A person is responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of the crime."

The net effect of the instructions therefore was to require the jury to determine whether each defendant actually entered the tavern, and to acquit any defendant found not to have entered the tavern. Nonetheless, the jury found each of the three co-defendants guilty.

The appellant contends that the facts of this case demonstrate such hostility between his interests and those of the Echols brothers that the public defender could not adequately represent all three. We agree, and hold that the public defender's representation of the Echols brothers prevented the public defender from loyally representing the appellant, thereby denying appellant the effective assistance of counsel guaranteed by the sixth and fourteenth amendments to the United States Constitution, and by section 8 of article I of our constitution (Ill. Const. 1970, art. I, sec. 8).

Although this court has in the past refused to presume that the interests of criminal co-defendants are necessarily hostile (*e.g., People v. Durley* (1972), 53 Ill. 2d 156, 160;

*People v. Somerville* (1969), 42 Ill. 2d 1, 9-10), where such hostility is shown to exist, the joint representation of the conflicting interests denies a defendant the effective assistance of counsel, and such denial is presumed to be prejudicial (*People v. Ware* (1968), 39 Ill. 2d 66, 67-68; *People v. Coslet* (1977), 67 Ill. 2d 127, 133. See also *People v. Kester* (1977), 66 Ill. 2d 162, 168; *People v. Stoval* (1968), 40 Ill. 2d 109, 113.) Thus, our threshold inquiry must be into the degree of hostility, if any, between the interests of appellant and the Echols brothers. (Appellant does not claim that the public defender's prior representation of Ferguson and Van Cook gave rise to a conflict of interest undermining his loyalty to the appellant.)

Appellant points to three examples of hostility between his best interests and those of the Echols brothers. First, appellant contends that the evidence of the Echols brothers' entry into the tavern (based on the descriptions of the clothing worn by the persons seen inside the tavern) was substantially stronger than that indicating that appellant had entered the tavern. Thus, appellant argues, "Counsel with undivided loyalty to Johnny Wilson could have pursued a line of defense which conceded that *** the clothing descriptions indicated that the Echols brothers committed the burglary rather than the defendant." While we agree that it is possible that an independent attorney might have pursued precisely such a strategy, it is also possible that he would have acted no differently than did the public defender in this case, lest he risk the introduction of rebuttal evidence which would have justified the giving of the accountability instruction rejected by the trial court in this case. In short, we do not know what strategy independent counsel would have pursued, and this court has in the past refused to find hostility between the interests of criminal co-defendants based on the mere possibility that one strategy available to

defense counsel would have helped one defendant at the expense of another. *E.g., People v. Durley* (1972), 53 Ill. 2d 156, 160; *People v. Robinson* (1969), 42 Ill. 2d 371, 374-75.

Appellant's second contention is that the evidence indicated that the tape player had been placed in the trunk without his knowledge by the Echols brothers, who were sitting in the back seat of the car (which, incidentally, was registered to appellant's brother), but that "such an argument could not be made because the exculpatory influences that could be drawn from the above facts for Johnny Wilson would have necessarily inculpated the Echols brothers." Like the appellant's first theory, however, the mere availability of such a strategy would, of itself, not render the interests of the defendants hostile under our prior decisions.

Finally, appellant also argues that once the confusion occurred regarding the source of the fingerprint it became obvious that counsel could not give undivided loyalty to both Johnny Wilson and Kenneth Echols. We agree. As the State now concedes, and as the public defender should have known, the fingerprint on the window was not that of appellant. Nonetheless, the public defender resisted the State's and the court's efforts to make that fact clear. Once the confusion occurred regarding the fingerprint, appellant's interests and those of the Echols brothers diverged dramatically. It requires no speculation to reach the conclusion that competent, independent counsel would have advised appellant to resolve that confusion, and would have argued in closing that, on balance, given all of the evidence, appellant never entered the tavern.

Thus, there was a material hostility between the interests of appellant and Kenneth Echols, and the public defender's commitment to Kenneth Echols prevented the public defender from representing the appellant with undivided loyalty. Appellant therefore was denied the

effective assistance of counsel, which denial was prejudicial and was not waived by appellant's silence. *People v. Coslet; People v. Kester.* See also *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457.

For the foregoing reasons, the judgments of the appellate and circuit courts are reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*